# In the United States Court of Federal Claims

No. 03-2263C
Filed: December 29, 2005
**TO BE PUBLISHED**

*******************************************
| | |
|---|---|
| * | |
| DEMARCO DURZO DEVELOPMENT CO., * | Breach of Contract; |
| * | Contract Disputes Act, |
| Plaintiff, * | 41 U.S.C. §§ 601 *et seq.*; |
| * | Deficiency in Certification; |
| v. * | Just Compensation Clause of the Fifth |
| * | Amendment to the United States |
| THE UNITED STATES, * | Constitution; |
| * | RESTATEMENT (SECOND) OF CONTRACTS |
| Defendant. * | §§ 58-59 (1981); |
| * | RCFC 56(c)-Summary Judgment. |

*******************************************

**K. Bradley Mellor and Rochelle R. Koerbel**, Bluming & Gusky, L.L.P., Pittsburgh, Pennsylvania, counsel for plaintiff Demarco Durzo Development Co.

**Andrew P. Averbach**, United Stated Department of Justice, Civil Division Commercial Litigation Branch, counsel for defendant, and **Robert J. McCall**, United States General Services Administration, Regional Counsel, Of Counsel.

## MEMORANDUM OPINION AND ORDER

**BRADEN, *Judge***

### RELEVANT FACTS[1]

---

[1] The relevant facts, recited herein, were derived from the following pleadings and portions of the record: Plaintiff's September 30, 2003 Complaint ("Compl."); Plaintiff's Response to Defendant's Proposed Finding of Undisputed Facts ("Pl. Resp. PPF"), and where the parties agreed, ("Pl. Resp. DPF") ("Stip."); Defendant's Response to Plaintiff's Proposed Findings of Undisputed Facts ("Def. Resp. PPF"), and where the parties agreed, ("Def. Resp. PPF") ("Stip."); Plaintiff's Motion for Partial Summary Judgment Exhibits ("PX __"); Defendant's Motion for Summary Judgment Appendix ("Def. Mot. for SJ App. at __").

**A.**     **The October 2, 1984 Lease Agreement**.

Plaintiff, DeMarco Durzo Development Co., is an unincorporated association engaged in the business of leasing commercial real property. *See* Compl. ¶¶ 1-2. The dispute in this case involves the termination of Lease No. GS-03B-40056 ("Lease"), under which Plaintiff leased the General Services Administration ("Gov't" or "GSA") office space, in Monroeville, Pennsylvania, for the Internal Revenue Service ("IRS"). *See* Pl. Resp. DPF ¶ 1 (Stip.). The Lease was prepared on government form, SF-2, titled U.S. Government Lease for Real Property and executed on October 2, 1984. *See* PX A.

In relevant part, the Lease provided:

1. The Lessor hereby leases to the Government the following described premises:

Approximately 4,860 net usable square feet of office space located on a portion of the fourth floor (floor plans to be forwarded under separate cover) of the Dedur Building, 2735 Mosside Boulevard, Monroeville, Pennsylvania.

to be used for such purposes as determined by the General Services Administration.

2. TO HAVE AND TO HOLD the said property with their appurtenances for the term beginning on See Rider to Lease through Paragraph 14, *subject to termination and renewal rights as may be hereinafter set forth*.

\* \* \*

9. If after the expiration date, the Government shall retain possession of the premises, *the lease shall continue in force and effect on a day-to-day basis not to exceed 90 days* and rental shall be paid on a pro-rata basis at the rate provided herein. This applies to the initial term as well as any renewal period.

\* \* \*

11. The total percentage of space occupied by the Government under the terms of the lease is equal to *22 percent of the total space available* in the lessor's building, and will be used as the basis for computing the Government's pro-rata share of real estate taxes, as defined in the Annual Real Estate Tax Escalation Clause.

PX A ¶¶ 1-2, 4, 9 (emphasis added) (underlining in original).

Paragraph 14 of an October 2, 1984 Rider to the Lease provided for an initial 10-year term, beginning upon completion of alterations Plaintiff was required to perform prior to the IRS's occupancy. *Id.* ¶¶ 3, 14. The Lease, however, permitted early termination:

2

> 4. *The Government may terminate this lease at any time after 5th year by giving at least 60 days' notice in writing* to the Lessor and no rental shall accrue after the effective date of termination.  Said notice shall be computed commencing with the day after the date of mailing.

PX A ¶ 4.

Although the Lease did not permit termination during the first five years, an adjustment was permitted of the monthly rate, in the event that the Government vacated the premises during the first five years:

> D4.  ADJUSTMENT FOR VACATED PREMISES
>
> If the Government vacates the lease premises *prior to the expiration of the firm term of the lease*, the rental rate shall be reduced by the cost of services and maintenance no longer required.  This reduction shall continue until the Government reoccupies the premises or the lease can be cancelled.

PX A ¶ D4 (emphasis added).

The Lease contained a preprinted paragraph setting forth renewal options, however, that paragraph was lined out and stamped "DELETED."  PX A ¶ 5.

The Lease also permitted alterations to the premises, but vested ownership of such alterations with the Government:

> The Government shall have the right during the existence of this lease to make alterations, attach fixtures and erect structures or signs in or upon the premises hereby leased, which fixtures, additions or structures so place, in, upon, or attached to the said premises *shall be and remain the property of the Government*.

PX A ¶ 4 (General Provisions) (emphasis added).  The Lease, however, did not address what condition the Government was required to leave the property in upon termination or expiration of the Lease.

**B.     Supplemental Lease Agreements Were Entered Between 1985-2000**.

Between 1985 and 2000, the parties executed 13 Supplemental Lease Agreements ("SLA").  *See* PX B-N.  Each SLA was evidenced by execution of GSA Form 276, *i.e.*, a General Services Administration Public Building Service Supplemental Lease Agreement, indicating that Lease No. GS-03B-40056 was being amended.  *Id.*  In relevant part, these forms provided:

3

*WHEREAS, the parties hereto desire to amend the above Lease . . .*

NOW THEREFORE, these parties for the consideration hereinafter mentioned covenant and agree that *the said Lease is amended* effective _____, as follows:

\* \* \*

*All other terms and conditions of the lease shall remain in force and effect.*

*Id.* (emphasis added).

With the exception of SLA's No. 7 and No. 12, each SLA operated by adding, deleting, substituting, or inserting text in the Lease. *Id.* Eight of the SLA's are relevant to the lawsuit now before the court.

After entering into the Lease on October 2, 1984,[2] the parties executed SLA No. 2 to "reflect addition of expansion space" and establish distinct term dates for the original and expanded units of space:

A.  Paragraph 1, Standard Form 2 of the lease, is amended by deleting the existing text and by substituting, in lieu thereof, the following:

"1.  The Lessor hereby leases to the Government the following described premises: approximately 6,380 net usable feet of office space and being further defined as *Unit 1 - 4,860 net usable square feet of office space on the fourth floor, Unit 2 - 1,520 net usable feet of office space on the third floor* in the Demarco-Durzo Building, 2735 Mosside Boulevard, Monroeville, PA."

B.  Paragraph 2, Standard 2 of the lease, is amended by deleting the existing text and by substituting, in lieu thereof, the following:

"1.  TO HAVE AND TO HOLD the said premises with there appurtenances for the following terms:

*Unit 1 - January 1, 1985 through December 31, 1995*;
*Unit 2 - From effective date of Supplemental Lease Agreement Number 2 to December 31, 1995*"

---

[2] SLA No. 2 and No. 3 are undated.  *See* PX C, D.  SLA No. 2, however, provides that the "Lease is amended, effective upon completion of alterations" to the premises.  PX C.  Similarly, SLA No. 3 indicates that the "Lease is amended, effective December 7, 1987."  PX D.

All units are subject to termination and renewal rights as may be hereinafter set forth.

\* \* \*

D.  Paragraph 11 of the Rider to the Lease, is amended by deleting the existing text and substituting, in lieu thereof, the following:

"11.  The total percentage of the space occupied by the Government under the terms of the lease is equal to:

*Unit 1 - 22 percent; and*
*Unit 2 - to be determined by measurement per Paragraph 19 of the Rider to Lease.*

of the building and will be used as the basis for computing the Governments pro-rata share of real estate taxes, as defined in Attachment No. 1 to Section D.

\* \* \*

F.  Addendum to Attachment No. 1 to Section D is hereby affixed and made part hereof"

"Addendum to Attachment No. 1 to Section D.  *The base year for Unit 1 is 1985 and the base year for Unit 2 is 1987."*

PX C at 1-3 (emphasis added).

SLA No. 3, effective December 7, 1987,[3] was executed "to establish square footage and establish a new effective date" for Unit 2, the expansion space added by SLA No. 2:

A.  Paragraph 1, Standard Form 2 of the Lease, is amended by deleting the existing text and substituting, in lieu thereof, the following:

"1.  The lessor hereby leases the Government the following described premises: 6, 127 net usable square feet of a office space being further defined as Unit 1- 4,860 net usable feet of office space on the fourth floor, *Unit 2 - 1,267 net usable square feet on the third floor* in the Demarco-Durzo Building, 2735 Mosside Boulevard, Monroeville, PA."

B.  Paragraph 2, Standard Form 2 of the Lease, is amended by deleting the existing text and substituting, in lieu thereof, the following:

Unit 1- January 1, 1985 through December 31, 1995;

---

[3] *See* note 2, *supra*.

*Unit 2 - December 7, 1987 though December 31, 1995*"

All units are subject to termination and renewal rights as may be hereinafter set forth.

\* \* \*

D. Paragraph 11 of the Rider to Lease, is amended by deleting the existing text and substituting, in lieu thereof, the following:

"11. The total percentage of the space occupied by the Government under the terms of the lease is equal to:

Unit 1 - 22 percent; and
*Unit 2 - 6 percent*

of the building and will be used as the basis for computing the Government's pro-rata share of the real estate taxes, as defined in Attachment No. 1 to Section D.

PX D at 1-2 (emphasis added).

On June 12, 1989, the parties executed SLA No. 4.  *See* PX E.  SLA No. 4, however, did not indicate the purpose for which it was executed.  *Compare* PX E *with* PX C, D.  The language of SLA No. 4, however, amended the Lease by increasing the net usable square feet of Unit 1 by 650 square feet:

A.  Paragraph 1 of Standard Form 2 of the Lease is hereby amended by deleting the existing text in its entirety and by inserting in lieu thereof the following:

"1.  Lessor hereby leases to the Government the following described premises: 6,777 net usable feet of office space, and being further defined as:

*Unit 1 - 5,510 net usable feet on the fourth floor,*
Unit 2 - 1,267 net usable feet on the third floor in the Demarco-Durzo Building, 2735 Mosside Boulevard, Monroeville, Pennsylvania, to be used for such purposes as may be determined by the General Services Administration."

\* \* \*

C.  Paragraph 11 of the Lease Rider is hereby amended by deleting the existing text in its entirety and by inserting in lieu thereof the following:

"10.  The *total percentage* of space occupied by the Government under the terms of the lese is equal to *31 percent* of the building and will be used as the basis for

6

computing the Government's pro-rata share of real estate taxes, as defined in Attachment No. 1 to Section D."

PX E at 1-2 (emphasis added).

Although SLA No. 4 increased the net usable square feet of Unit 1, SLA No. 4 did not amend the unit term dates in Paragraph 2 of the Lease. *Id.*

On December 4, 1992, the parties executed SLA No. 5 "[f]or first floor expansion and alterations to the 1st, 3rd, and 4th floors," thereby, initiating the addition of 850 usable square feet on the first floor to the Lease. *See* PX F. SLA No. 5 also first introduced renewal options to the Lease:

A. Paragraph 20 is hereby added to the Lease as follows:

"20a. *The Lessor hereby leases to the Government approximately 850 net usable square feet of office space on the 1st floor* of the Demarco-Durzo Building 2735 Mosside Boulevard, Monroeville, Pennsylvania, to be used for such purposes as determined by the General Services Administration.

\*   \*   \*

20d. *The percentage of space shall be adjusted following acceptance of the space.*"

\*   \*   \*

B. Paragraph 5 of the Lease is amended by deleting the existing text and inserting in lieu [thereof] the following:

"5. This lease may be renewed at the option of the Government, for the following terms and at the following rentals:

*Two (2) five (5) year renewal option at the current rental rate plus accrued escalation provided notice be given in writing to the Lessor at least ninety (90) days before the end of the original lease term or any renewal term; all other terms and conditions of this lease shall remain the same during any renewal term. Said notice shall be computed commencing with the day after the date of the mailing.*"

PX F at 1-3 (emphasis added).

On January 14, 1993, the parties executed SLA No. 6 "to increase net usable square footage; rental; and percentage of space occupied by the government" by finalizing the addition of 880 square feet of usable office space, Unit 3, initiated in SLA No. 5:

7

A.  Paragraph 1 of Standard Form 2 of the Lease is hereby amended by deleting the existing text in its entirety and by inserting in lieu thereof the following:

"1.  The Lessor hereby leases to the Government the following described premises: 7657 Net Usable Square Feet of office space and being further defined as:

> Unit 1 - 5510 net usable square feet on the 4th floor
> Unit 2 - 1,267 net usable square feet on the 3rd floor
> *Unit 3 - 880 net usable square feet on the 1st floor*

in the Demarco-Durzo Building, 2735 Mosside Boulevard, Monroeville, Pennsylvania, to be used for such purposes as may be determined by the General Services Administration."

B.  Paragraph 2 of Standard Form 2 of the Lease is hereby amended by deleting the existing text in its entirety and by inserting in lieu there of the following:

"2.  TO HAVE AND TO HOLD the said premises with their appurtenances for the terms beginning on:

> Unit 1 - January 1, 1985 through December 31, 1995;
> Unit 2 - December 7, 1987 through December 31, 1995;
> *Unit 3 - November 25, 1992, through December 31, 1995;*

*Units 1, 2, and 3 are subject to termination and renewal rights, in its entirety or in part, as may be hereinafter set forth.*"

\*   \*   \*

D.  Paragraph 11 of the Lease Rider is hereby amended by deleting the existing test in its entirety and by inserting in lieu thereof the following:

"10.  The *total percentage of space* occupied by the Government under the terms of the lease is equal to *35 percent* of the building and will be used as the basis for computerizing [sic] the Government's pro-rata share of real estate taxes, as defined in Attachment No. 1 to Section D."

PX G at 1-2 (emphasis added).

On October 4, 1994, the parties executed SLA No. 9 "to exercise one five year renewal option," thereby, extending the term of the Lease to December 31, 2000.  *See* PX J.  In doing so, the parties departed from their past practice of maintaining distinct term dates for the three units of space under the Lease:

A.  Paragraph 2 of the lease is hereby amended by deleting it in its entirety and inserting the following in lieu thereof:

"2.  TO HAVE AND TO HOLD the said premises with their appurtenances for the term beginning on *January 1, 1985 through December 31, 2000*, subject to termination and renewal rights as may be hereinafter set forth."

\* \* \*

E.  Paragraph 5 of the Lease is amended by deleting the existing text and inserting in lieu their [sic] of the following:

"5.  *The Government exercises one (1) renewal option with one (1) renewal option remaining*.  The remaining option shall be at the current rental rate plus accrued escalation, provided notice be given in writing to the Lessor at least ninety (90) days before the effective date of the renewal.  *All other terms and conditions of this lease shall remain the same during any renewal term.*  Said notice shall be computed commencing with the day after the date of mailing."

PX J at 1-2 (emphasis added).

On September 25, 1996, the parties executed SLA No. 10 "to incorporate 2 additional 5 year renewal options:"

B.  *Paragraph 5 of Standard Form 2 of the Lease is hereby amended* by deleting the existing text in its entirety and inserting the following in lieu thereof:

"5.  This lease may be renewed at the option of the Government for the following terms and at the following rentals: Three (3) - five (5) year renewal options at the rate at the time of lease expiration plus accrued operating cost escalations provided notice be given in writing to the Lessor at least ninety (90) days before the end of the original lease term or and renewal term; *all other terms and conditions of this lease shall remain the same during any renewal term.*  Said notice shall be computed commencing with the day after the date of mailing."

PX K at 1 (emphasis added).

On March 1, 2000, the parties executed SLA No. 13, "to exercise one (1) - five (5) year renewal option," thereby extending the term of the lease to December 31, 2005:

A.  Paragraphs 2 and 3 of Standard Form 2 of the Lease are hereby amended by deleting the existing text in its entirety and inserting the following in lieu thereof:

9

"2.  TO HAVE AND TO HOLD the said premises with their appurtenances for the term *beginning January 1, 1985 through December 31, 2005 subject to termination and renewal rights as may be hereinafter set forth.*

PX N at 1 (emphasis added).

None of the thirteen SLA's entered by the parties changed the Government's right to terminate the Lease after the 5th year, pursuant to paragraph 4 of the October 2, 1984 Lease.

**C.     Termination Of The Lease.**

On March 10, 2000, the responsible GSA Contracting Officer ("CO") advised Plaintiff in writing that GSA intended to "pursue an alternate lease location," pursuant to the "termination rights" of the Lease.  *See* PX O.  Plaintiff also was advised that GSA anticipated terminating the Lease as early as December 2000, but no later than June 2001.  *Id*.  In a March 24, 2000 follow-up letter, the CO advised Plaintiff that "it is in the best interest of the Government to search for a competitive lease.  As stated in [my] letter, the earliest this relocation would occur is December of this year [2000] and the latest is June, 2001." PX P.  GSA, however, did not vacate the Monroeville, Pennsylvania property in June 2001, and continued to occupy the property and pay rent, pursuant to the terms of the Lease.  *See* Pl. Resp. DPF ¶ 15 (Stip.).

On March 25, 2003, the CO issued an "official Notice of Termination by the Government for the [Monroeville, Pennsylvania] lease" and informed Plaintiff that "[i]n accordance with the provisions of the lease, the lease will terminate 60 days from the date of this letter being mailed.  All items will be removed from the space prior to that date and the space returned to you in a broom clean condition."  PX Q.  Although the IRS ceased operations at the site, GSA failed to remove a customer service counter from the space within 60 days, as required.[4]  *See* Def. Mot. for SJ App. at 117 (Demarco Dep.).  In July 2003, GSA last paid rent covering the period through June 2003.  *See* Def. Resp. PPF ¶ 12 (Stip.).  In vacating the property, however, Plaintiff alleges that GSA removed certain security equipment owned by Plaintiff.  *See* Def. Mot. for SJ App. at 117; Pl. Resp. DPF ¶ 17.

---

[4] The parties' briefs and supporting documents do not permit the court to determine whether or when the Government actually removed the customer service counter from the premises.  *Compare* Def's Resp. PPF ¶13 ("13. Defendant vacated the property in June of 2003.  Response: Disagrees.  The Government vacated the premises on May 25, 2003. "); *with* Pl. Resp. DPF ¶ 17 ("17.  The Government vacated the premises on May 25, 2003, and paid rent through August 2003.  Response: Denied. The Government did not vacate the premises until August 2003, and paid rent through July of 2003."); *see also* Def. Mot. for SJ App. at 117 (Demarco Dep.).

## PROCEDURAL BACKGROUND

On April 17, 2003, Plaintiff's counsel sent a letter to the CO, pursuant to the Contract Disputes Act, 41 U.S.C. §§ 601 *et seq.*, setting forth specific claims against GSA and requesting a decision within 60 days.[5]  *See* Compl. ¶ 19; *see also* Compl. Ex. G; Pl. Opp. at 3.

On May 7, 2003, the CO notified Plaintiff by letter that a final decision would be issued no later than August 16, 2003.  *See* Compl. Ex. H.  The CO, however, failed to issue a final decision on that date or otherwise.  *See* Compl. ¶ 23; *see also* Pl. Opp. at 3.  Therefore, as a matter of law, such inaction is deemed a denial of Plaintiff's claims.  *See* 41 U.S.C. § 605(c)(5).

On September 30, 2003, Plaintiff filed a Complaint in the United States Court of Federal Claims alleging breach of contract (Count I), estoppel (Count II), and takings claims (Count III).  *See* Compl. ¶¶ 26-50.  On January 12, 2004, the United States, on behalf of GSA ("the Government"),

---

[5] The April 2003 letter stated:

In March of 2000, the [GSA] executed Supplemental Lease Agreement No. 13 opting to renew its Lease with [DeMarco] for the lease space for a five (5) year renewal period terminating on December 31, 2005.  In reliance upon this Lease Agreement, [DeMarco] undertook to complete a number of structural improvements and alterations to the leased premises at the United States' request.  Thereafter, on March 10, 2000 and again on March 24, 2000, the United States notified [DeMarco] that it intended to prematurely terminate the Lease <u>no later than</u> June, 2001. Subsequently, however, the [GSA] failed to vacate the premises on or before June, 2001 and instead has continued to occupy the property to the present date.  As a result of this action, [DeMarco] lost any opportunity at that time to lease the premises to another tenant. Moreover, [DeMarco] reasonably relied upon the United States' decision not to vacate the premises in June of 2001 as the government's good faith intention to fulfill its contractual obligations toward the expiration of the Lease Agreement and on that basis was deprived of any opportunity to rent the premises to prospective tenants.  By its actions, the [GSA] has waived any right it may have previously had to prematurely terminate the Lease Agreement.  The [GSA] is now estopped from again attempting to terminate its Lease Agreement with [DeMarco] and instead must satisfy its obligations under the Lease Agreement which provides for the United States to pay [DeMarco] monthly rental payments in the amount of $11,664.16 through December 31, 2005.  An additional thirty-one (31) months remain until the expiration of the Contract with [DeMarco].  By prematurely terminating the Lease Agreement, the United States has defaulted on its Contract with [DeMarco] and is indebted to [DeMarco] for the full amount of the remaining Lease period totaling $362,969.69.

Compl. Ex. G (emphasis in original).

filed a Motion to Dismiss, pursuant to RCFC 12(b)(6). On February 12, 2005, Plaintiff filed a Brief in Opposition. On March 1, 2005, the Government filed a Reply. On May 20, 2005, the court issued a Memorandum Opinion and Order granting, in part, and denying, in part, the Government's January 12, 2004 Motion to Dismiss, thereby dismissing Count II, because Plaintiff failed to state a claim on which relief can be granted, by not alleging the requisite elements to support an estoppel claim. *See DeMarco Durzo Development Co.* v. *United States*, 60 Fed. Cl. 632, 639 (2004).

On July 15, 2005, the Government filed a Motion for Summary Judgment as to Counts I and III and Plaintiff filed a Motion for Partial Summary Judgment regarding the same. On August 14, 2005, the Government filed Defendant's Opposition to Plaintiff's Motion for Summary Judgment and Plaintiff filed Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment. On September 15, 2005, the Government filed Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment. Plaintiff did not file a Reply.

## DISCUSSION

### A. **Jurisdiction**.

Pursuant to the Contract Disputes Act, 41 U.S.C. §§ 601, *et seq*., the United States Court of Federal Claims has jurisdiction to adjudicate a breach of contract claim, however, the plaintiff must exhaust available administrative remedies by first seeking and obtaining a formal decision from the responsible Contracting Officer ("CO"). *See* 41 U.S.C. § 605(a).

In addition, where, as here, a claim for breach of contract against the Government exceeds $100,000,[6] a certification is required to affirm that: (1) the claim is made in good faith; (2) the supporting data is accurate and complete to the best of certifier's knowledge; (3) the amount requested accurately reflects the contract adjustment for which the contractor believes the

---

[6] In relevant part, 41 U.S.C. 605 provides:

(c) Amount of claim; certification; notification; time of issuance; presumption

(1) A contracting officer shall issue a decision on any submitted claim of $100,000 or less within sixty days from his receipt of a written request from the contractor that a decision be rendered within that period. For claims of more than $100,000, the contractor shall certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable, and *that the certifier is duly authorized to certify the claim on behalf of the contractor*.

41 U.S.C. § 605 (c)(1) (emphasis added).

Government is liable; and, (4) the certifier is duly authorized to certify the claim on behalf of the contractor. *See* 41 U.S.C. § 605(c)(1). In this case, the Complaint cites Exhibit G, thereto, as evidence of Plaintiff's compliance with 41 U.S.C. § 605, however, Exhibit G does not comply with the requirements of 41 U.S.C. § 605. Exhibit G, signed by Plaintiff's counsel, states only that: "This law firm represents the Demarco-Durzo Corporation . . . Demarco-Durzo certifies that the claim is made in good faith, that the supporting data are accurate and complete to the best of its knowledge and belief, and that the amount requested accurately reflects the contract adjustment for which Demarco-Durzo believes the government is liable." Compl. at Ex. G. Therefore, Exhibit G fails to satisfy the requirements of 41 U.S.C. § 605, because it does not provide that Plaintiff's counsel "is duly authorized to certify the claim on behalf of the contractor." *See* Compl. at Ex. G. Even if Exhibit G included the requisite language that Plaintiff's counsel was "authorized to certify the claim on behalf of the contractor," Exhibit G would, nevertheless, be deficient, because it would attest only that Plaintiff, not the undersigned attorney, certifies the claim.

This procedural deficiency, however, does not deprive the court of jurisdiction, because, pursuant to 41 U.S.C. § 605(c)(6): "[a] defect in the certification of a claim shall not deprive a court or an agency board of contract appeals of jurisdiction over that claim," provided that "[p]rior to the entry of a final judgment by a court or a decision by an agency board of contract appeals, the court or agency board shall require a defective certification to be corrected." 41 U.S.C. § 605(c)(6).

With the exception of the non-fatal certification deficiency noted above, Plaintiff's claim properly and timely was filed with the CO, who did not issue a decision within the statutory time period. *See* Compl. ¶ 23. Accordingly, the court has jurisdiction because "[a]ny failure by the [CO] to issue a decision on a contract claim within the period required will be deemed to be a decision by the [CO] denying the claim and will authorize the commencement of . . . suit on the claim as otherwise provided in this chapter." 41 U.S.C. § 605(c)(5).

**B.     Standard For Decision On A Motion For Partial Summary Judgment-RCFC 56(c)**.

On a motion for summary judgment, if there is no genuine issue as to any material fact, the moving party is entitled to judgment as a matter of law. *See Moden* v. *United States*, 404 F.3d 1335, 1342 (Fed. Cir. 2005) ("Summary judgment is only appropriate if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."); *see also* RCFC 56(c). In the United States Court of Federal Claims, summary judgment, albeit interlocutory in nature, may be rendered on the issue of liability, even if a genuine issue of fact exists as to the entitlement to damages and the amount thereof. *See Winstar Corp.* v. *United States*, 518 U.S. 839, 910 (1996) (affirming grant of partial summary judgment on contract liability and remanding the determination of the appropriate measure or amount of damages, if any.); *see also* RCFC 56(c).

Only genuine disputes of material facts that might affect the outcome of the suit will preclude entry of summary judgment. *See Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) ("As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry

of summary judgment.    Factual disputes that are irrelevant or unnecessary will not be counted. . . .   That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs.").  The existence of "some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]"  *Id*.  Therefore, there is no issue for the court to adjudicate unless the nonmoving party puts forth evidence sufficient for a jury to return a verdict for that party; but "if the evidence is merely colorable or is not significantly probative, summary judgment may be granted."  *Id*. at 249-50 (citations omitted).

The burden of demonstrating the absence of any genuine issue of material fact is on the party moving for summary judgment.  *See Celotex Corp.* v. *Catrett*, 477 U.S. 317, 325 (1986) (holding the moving party must meet its burden "by 'showing' – that is pointing out to the [trial court] that there is an absence of evidence to support the nonmoving party's case"); *see also Riley & Ephriam Constr. Co., Inc.*, 408 F.3d 1369, 1371 (Fed. Cir. 2005) ("The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.").  A summary judgment may be made without supporting affidavits and rely "solely on the pleadings, depositions, answers to interrogatories, and admissions on file."  *Celotex Corp.*, 477 U.S. at 324.  Once the moving party demonstrates the absence of a genuine issue of material fact, however, the burden shifts to the non-movant to establish the existence of a genuine issue that can only be resolved at trial.  *See Novartis Corp.* v. *Ben Venue Laboratories*, 271 F.3d 1043, 1046 (Fed. Cir. 2001) (explaining that, once the movant has demonstrated the absence of a genuine issue of material fact, "the burden shifts to the nonmovant to designate specific facts showing that there is a genuine issue for trial").

Therefore, a trial court is required to resolve all doubt over factual issues in favor of the non-moving party.  *See Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 587 (1987).  And, all reasonable inferences and presumptions must be resolved in favor of the non-moving party.  *See Anderson*, 477 U.S. at 255; *see also Moden*, 404 F.3d at 1342 ("[A]ll justifiable inferences [are drawn] in favor of the party opposing summary judgment.").

In this case, the fact that both parties have moved for summary judgment does not relieve the trial court of responsibility to determine the appropriateness of summary disposition.  *See Stratos Mobile Networks USA, LLC* v. *United States*, 213 F.3d 1375, 1379 (Fed. Cir. 2000) (quoting *Prineville Sawmill Co., Inc.* v. *United States*, 859 F.2d 905, 911 (Fed. Cir. 1988)) ("[The court] determines for itself whether the standards for summary judgment have been met.").   Summary judgment will not necessarily be granted to one party or another when both parties have filed motions.  *See California* v. *United States*, 271 F.3d 1377, 1380 (Fed. Cir. 2001) ("The mere fact that the parties have cross-moved for summary judgment does not impel a grant of at least one motion[.]").   The court must evaluate each party's motions on their own merit.  *Id.*

14

**C.      The Court's Resolution Of Pending Motions.**

      **1.      The Parties' Cross-Motions For Summary Judgment On Count I (Breach of Contract Claim).**

Count I alleges that the Government's termination of the Lease prior to December 31, 2005, constitutes a breach of contract. *See* Compl. ¶¶ 26-36. The parties do not dispute the validity of the Lease or SLA's, nor that Paragraph 4 of the Lease grants the Government the option to terminate the Lease early after the 5th year. The parties, however, dispute whether the Government's early termination option accrued. *Compare* Def. Mot. for SJ at 8, 9 (arguing that the Lease clearly and unambiguously grants the Government the option to terminate the Lease at any time after five years and, therefore, the Government's termination of the Lease 19 years after the Lease was unquestionably authorized) *with* Pl. Opp. to Def. Mot. for SJ at 7 (arguing that the Government's right to terminate had not yet accrued because SLA No. 13 constituted a new lease under which the termination provision of the original Lease "would only 'kick in' in a Lease of more than five (5) years."). Plaintiff also argues that the Government either breached an implied covenant to vacate the property or waived the right to terminate the Lease by continuing to occupy the property after June 2001, *i.e.*, the latest date CO's March 2000 letters indicated that the Government would occupy the premises. *See* Compl. ¶¶ 26-36; Pl. Br. in Sup. Pl. Mot. for SJ at 7; Pl. Br. in Opp. Def. Mot. for SJ at 14.

Resolution of the parties' Cross-Motions for Summary Judgment on Count I, therefore turns not only on whether the Government's early termination option accrued, but also on whether the Government properly exercised that option, if it accrued.

      **a.      The Government's Early Termination Option Accrued On January 1, 1990.**

The Lease grants the Government the option to terminate the Lease after the 5th year. *See* PX A ¶ 4. The parties, however, dispute whether and when the early termination option accrued. *See* Pl. Br. in Opp. to Def. Mot. for SJ at 8-10; Def. Mot. for SJ at 8-10. Plaintiff asserts that SLA No. 13 exercised a five-year renewal option and therefore was a new lease. *See* Pl. Opp. to Def. Mot for SJ at 3, 10-11. In sum, Plaintiff argues that Paragraph 4 of the Lease did not "kick in." *Id.* at 12. The Government counters that SLA No. 13 amended the original Lease and, therefore, the Government's early termination of the renewal period 19 years after the Lease was executed on October 2, 1984 was authorized by paragraph 4 of the Lease, as was the case with the twelve SLA's. *See* Def. Mot. for SJ at 11.

In *Alliant Techsystems, Inc.* v. *United States*, 178 F.3d 1260, 1275-76 (Fed. Cir. 1999), the United States Court of Appeals for the Federal Circuit held that: "Obligations arising from the exercise of an option are part of a new contract only when the option was the principal subject matter of the bargain, *i.e.*, an option contract." That rule is recognized to apply to Government contracts. *Id.* In this case, the Government's five-year renewal options were not a subject of the original October 2, 1984 contract between the parties. In fact, the Lease did not provide for renewal until

SLA No. 5 was executed in 1992.  *See* PX A, F.  Accordingly, contrary to Plaintiff's assertions, the Government's exercise of the first of two five-year renewal options did not create a new lease.

Additionally, the United States Court of Appeals for the Federal Circuit consistently has held that general rules of interpretation apply when the United States is a party to a contract and, therefore, government contract interpretation begins with the plain language thereof.  *See Scott Timber Co.* v. *United States,* 333 F.3d 1358, 1366 (Fed. Cir.2003).  Moreover, when the terms of a contract are "phrased in clear and unambiguous language, they must be given their plain and ordinary meaning[.]"  *Coast Fed. Bank, FSB* v. *Unites States,* 323 F.3d 1035, 1038 (Fed. Cir. 2003) (citing *McAbee Constr., Inc.* v. *United States,* 97 F.3d 1431, 1435 (Fed. Cir. 1996)).

In this case, the court has determined that the language of the October 2, 1984 Lease and the SLA's is clear and unambiguous.  The standard Government form language of each of the thirteen SLA's evidenced the parties' intent to amend the original October 2, 1984 Lease rather than enter into a series of new leases:

> *WHEREAS, the parties hereto desire to amend the above Lease . . .*

> NOW THEREFORE, these parties for the consideration hereinafter mentioned covenant and agree that *the said Lease is amended* effective _____, as follows:

> \* \* \*

> *All other terms and conditions of the lease shall remain in force and effect.*

*See* PX B-N (emphasis added).

Therefore, SLA No. 5, which introduced renewal options to the Lease, like each of the thirteen SLA's, evidenced the parties' intent to amend the October 2, 1984 original Lease, by deleting and inserting text into the original Lease, rather than an intent to enter into a new lease:

> B. *Paragraph 5 of the Lease is amended by deleting the existing text and inserting in lieu [thereof] the following:*

> "5.  This lease may be renewed at the option of the Government, for the following terms and at the following rentals:

> Two (2) five (5) year renewal option at the current rental rate plus accrued escalation provided notice be given in writing to the Lessor at least ninety (90) days before the end of the original lease term or any renewal term; *all other terms and conditions of this lease shall remain the same during any renewal term.*  Said notice shall be computed commencing with the day after the date of the mailing."

PX F at 3 (emphasis added).

16

The parties also had a consistent practice of maintaining distinct term dates for the various units of space added to the Lease[7] and subsequently agreed to amend the Lease by establishing January 1, 1985 as the start date for all three units, thereby evidencing their intent that the accrual of the Government's early termination option be measured from the unit term dates enumerated in paragraph 2 of the Lease. *See* PX C ("Unit 1 - January 1, 1985 through December 31, 1995; Unit 2 - From effective date of Supplemental Lease Agreement Number 2 to December 31, 1995"); PX D ("Unit 1 - January 1, 1985 through December 31, 1995; Unit 2 - December 7, 1987 to December 31, 1995"); PX G ("Unit 1 - January 1, 1985 through December 31, 1995; Unit 2 - December 7, 1987 to December 31, 1995; November 25, 1992, through December 31, 1995"); PX J ("[T]he said premises for the term beginning on January 1, 1985 through December 31, 2000"). Accordingly, the Government's early termination option accrued on January 1, 1990, *i.e.*, five years after the beginning of the consolidated term dates contained in paragraph 2 of the Lease, as amended by SLA No. 9. *See* PX J.

Finally, the parties' repeated qualification of the October 2, 1984 Lease term, *i.e.*, with the language "subject to termination and renewal rights as may be hereinafter set forth," evidences that the five-year renewal option, extending the term of the October 2, 1984 Lease through December 31, 2005, was subject to an accrued early termination option, as provided for in Paragraph 4 of the Lease.

> **b.      At This Junction, However, The Record Does Not Evidence Whether Or When The Government Exercised The Early Termination Option.**

Determining that the Government's early termination option accrued, however, is not the end of the inquiry. Resolution of the parties' Cross-Motions for Summary Judgment on Count I requires the court to determine whether or when the Government properly exercised that option. The Government denies that the CO's March 2000 letters exercised the Government's early termination option and, instead, asserts that the CO's March 25, 2003 letter exercised the early termination option. *See* Def. Mot. for SJ at 6, 10. Plaintiff counters that SLA No. 13 was a new five-year lease, under which an early termination option could not accrue. In the alternative, Plaintiff argues that the Government violated an implied duty to vacate the premises and waived early termination rights, by exercising the early termination option in the CO's March 2000 letters, and then failing to vacate the premises on the promised date. *See* Compl. ¶¶ 26-36; *see also* Pl. Br. in Sup. Pl. Mot. for SJ at 7; Pl. Br. in Opp. Def. Mot. for SJ at 14. Plaintiff's alternative argument is premised on the assumption that the CO's March 2000 letters were an effective exercise of the Government's early termination option. *Id.*

First, neither of the CO's March 2000 letters evidenced the requisite present intent to exercise the Government's early termination option. *See Uniq Computer Corp.* v. *United States*, 20 Cl. Ct.

---

[7] The parties' briefs, exhibits, and proposed findings of undisputed fact do not provide sufficient information for the court to determine whether SLA No. 4 added 650 square feet to the Lease or merely corrected a 650 square foot error in the original dimensions of Unit 1. *See* PX E. SLA No. 4, however, did not alter the term dates for Unit 1. *Id.*

222, 232 (Cl. Ct. 1990) (holding that the Government failed to exercise an option, because a "statement by the optionee of a present intention to accept in the future is different from a statement of an intention to accept now"). In fact, the CO's March 10, 2000 and March 24, 2000 letters indicate only a future, rather than "present intent" to exercise the early termination option. *See* PX O ("Once adequate lease space is procured, we will issue our official termination letter identifying an effective date for this action."); *see also* PX P ("However, it is in the best interest of the Government to search for a competitive lease."). Therefore, as an initial matter, the court has determined that the CO's March 2000 letters did not exercise the Government's early termination option.

Second, the United States Court of Appeals for the Federal Circuit has held that "to properly exercise [an] option, the government's acceptance of the offer had to be in exact accord with the terms of the contract[.]" *New England Tank Indus. of New Hampshire, Inc.* v. *United States*, 861 F.2d 685, 687 (Fed. Cir. 1989); *see also Uniq Computer Corp.* v. *United States*, 20 Cl. Ct. 222, 231-32 (1990) (quoting A. Corbin, CORBIN ON CONTRACTS, A COMPREHENSIVE TREATISE ON THE WORKING RULES OF CONTRACT LAW §264 (1963) (The exercise of an option "must be *unconditional and in exact accord* with the terms of the option.") (emphasis added)) (quoting *Civic Plaza Nat'l Bank* v. *First Nat'l Bank of Dallas*, 401 F.2d 193 (8th Cir. 1968)) ("The acceptance of an option, to be effective, must be unqualified, absolute, unconditional, unequivocal, unambiguous, positive, without reservation, and *according to the terms or conditions of the option* . . . An acceptance of an option must be such a compliance with the conditions as to bind the parties, and if it fails to do so it binds neither." (emphasis added)). Therefore, as a matter of law, an attempted exercise of an option is ineffective, unless it is in "exact accord" with the terms of the option. *See Lockheed Martin IR Imaging SYS., Inc.* v. *West*, 108 F.3d 319, 323-24 (Fed. Cir. 1997) (holding the "partial exercise" of an option improper); *International Telephone and Telegraph, ITT Defense Communications Div.* v. *United States*, 453 F.2d 1283 (Ct. Cl. 1972) (holding that a contracting officer's telegraphic notice that was sent on last date for giving notice, but not received until following morning, and contracting officer's oral notice on last date for notifying contractor was insufficient as a matter of law to "exercise an option," where the contract provided that the contracting officer must notify the contractor of the exercise of an option, in writing, not later than a specified date); *Uniq Computer*, 20 Cl. Ct. at 231 (citing S. Williston, A TREATISE ON THE LAW OF CONTRACTS § 61D (3d ed. 1957) ("This requirement is strictly construed.").

In this case, although the CO's March 25, 2003 letter is not in "exact accord" with terms of the Lease, the Government argues that the letter exercised the Government's early termination option. In relevant part, the Lease provided:

> 4. The Government may terminate this lease at any time after 5th year by giving at least 60 days' notice in writing to the Lessor and no rental shall accrue after the effective date of termination. *Said notice shall be computed commencing with the day after the date of mailing.*

PX A ¶ 4 (emphasis added). In contrast, the CO's March 25, 2003 letter provided:

> This letter shall serve as official Notice of Termination by the Government for the
> above referenced lease.  In accordance with the provisions of the lease, the lease will
> terminate 60 days *from the date of this letter being mailed*.

PX Q (emphasis added).  The bottom line is that the CO's letter seeks to initiate the running of the required 60 day early termination notice a day earlier than provided for in the Lease.  In addition, although the Lease is silent as to the condition that the Government was obligated to return the premises to upon termination of the Lease, the CO's March 25, 2003 letter provides: "All items will be removed from the space prior to that date and the space returned to you in broom clean condition. An exit walkthrough will be scheduled with you or your appointed representative prior to the scheduled date of termination."  PX Q.

Therefore, to the extent that the March 25, 2003 letter unilaterally imposed additional termination conditions to those agreed to and evidenced by the October 2, 1984 Lease Agreement, such language transforms the Government's putative acceptance of an early termination option into a counteroffer.  *See* RESTATEMENT (SECOND) OF CONTRACTS (1981) ("RESTATEMENT") § 58 ("An acceptance must comply with the requirements of the offer as to the promise to be made or the performance to be rendered."), *see also* RESTATEMENT § 59 ("A reply to an offer which purports to accept it but is conditional on the offeror's assent to terms additional to or different from those offered is not an acceptance but is a counter-offer."); S. Williston, A TREATISE ON THE LAW OF CONTRACTS § 6:13 (4th ed. 1991) ("The conditional acceptance is, therefore, itself a counteroffer.").

Since neither party identified or briefed this issue, the court cannot determine whether these discrepancies were the result of a mistaken belief regarding the terms of the Government's early termination option, a scrivener's error, or an attempt to unilaterally amend the Lease.  Accordingly, the court cannot determine at this juncture whether or when the Government exercised the early termination option.

### c.    The Record Permits The Court To Grant Summary Judgment On Count I For the Period Up To And Including June 2003.

The court, however, has determined that the Government is entitled to partial summary judgment on Count I for the period up to and including June 2003, *i.e.*, the last month that the Government paid rent in accordance with the Lease.

### 2.    The Parties' Cross-Motions For Summary Judgment on Count III (Takings Claim).

Count III of the Complaint alleges two distinct takings of Plaintiff's property.  *See* Compl. ¶¶ 45-50.  First, the Complaint alleges that the Government took real property by remaining in possession of the property after it attempted prematurely to terminate the Lease Agreement.  *Id.* ¶¶ 46-48; *see also* Pl. Br. in Opp. at 16.  Second, Count III alleges a taking of security equipment that

was "erroneously removed" by the Government.[8]  *Id.* ¶¶ 22, 45.  The Government responds that there has been no taking of real property, because GSA occupied the premises after June 31, 2001, *i.e.*, after the latest date GSA originally estimated that the Government would vacate the premises, pursuant to the terms of the Lease.  *See* Def. Mot. for SJ at 16.

The Just Compensation Clause of the Fifth Amendment to the United States Constitution provides, in part, "nor shall private property be taken for public use, without just compensation." U.S. Const., Amend. V.  The plaintiff bears the burden of demonstrating that a property interest exists.  *See Skip Kirchdorfer, Inc.* v. *United States*, 6 F.3d 1573, 1582 (Fed. Cir. 1993) ("To recover under the Takings Clause, a claimant with a recognized property interest must show that its interest was 'taken.'").  Property rights include "the rights 'to possess, use and dispose of [property].'" *Id.* at 1579 (quoting *United States* v. *General Motors Corp.*, 323 U.S. 373, 378 (1945)); *see also M & J Coal* v. *United States*, 47 F.3d 1148, 1153 (Fed. Cir. 1995).  To the extent that the Government physically occupies property, however, it effectively destroys each of these rights.  *See Loretto* v. *Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 438 (1982) ("The dissent asserts that a taking of about one-eighth of a cubic foot of space is not of constitutional significance . . . these facts are not critical: whether the installation is a taking does not depend on whether the volume of space it occupies is bigger than a breadbox.").

As a matter of law, however, a taking cannot occur when the Government occupies property, pursuant to a valid lease.  Accordingly, in this case, resolution of the parties' Cross-Motions for Summary Judgment on Count III turns on whether the Government occupied the premises after the termination of the Lease.

The initial flaw in Plaintiff's takings analysis is that the CO's March 2000 letters were not an exercise of the Government's early termination option.  Moreover, even if the court determined that the CO's March 25, 2003 letter was a proper exercise of the Government's early termination option, the earliest a taking could have accrued was May 25, 2003, *i.e.*, the effective date of the termination.[9]  In that event, however, a genuine issue of material fact exists that would prevent the court from granting summary judgment to either party.  Specifically, a genuine issue of material fact

---

[8] The parties' Cross-Motions for Summary Judgement on Count III do not address the issue of the alleged taking of Plaintiff's security system.  *See* Pl. Mot. for PSJ; Def. Mot. for SJ. Accordingly, the court's resolution of the parties' Cross-Motions for Summary Judgment on Count III does not extend to the alleged taking of Plaintiff's security system.  *See* Compl. ¶¶ 22, 45.

[9] Although the Lease provides for an automatic extension upon "expiration" of the Lease, the court finds that provision inapplicable upon termination of the Lease.  *Compare* PX A ¶ 9 ("If after the *expiration date*, the Government shall retain possession of the premises, the lease shall continue in force and effect on a day-to-day basis not to exceed 90 days and rental shall be paid on a pro-rata basis at the rate provided herein.") (emphasis added) *with* PX A ¶ 4 ("The Government may *terminate* this lease at any time after 5th year by giving at least 60 days' notice in writing to the Lessor and *no rental shall accrue after the effective date of termination*.") (emphasis added).

exists as to when the Government ceased physically occupying the premises.[10]  On the other hand, were the court to determine that the CO's March 25, 2003 letter was not a proper exercise of the Government's early termination option, no taking could have accrued, because the Lease term has not yet expired.  The Government, therefore, is only entitled to partial summary judgment on Count III, because no taking could have accrued prior to May 25, 2003, *i.e.*, the effective date of the termination, assuming the CO's March 25, 2003 letter was in fact an effective exercise of the Government's accrued early termination option.  *See* Def. Mot. for SJ App. at 117 (Demarco Dep.).

## CONCLUSION

For the foregoing reasons the Government's Motion for Summary Judgment is **GRANTED**, in part, and **DENIED**, in part.  Specifically, the Government is entitled to summary judgment on Count I for the period up to and including June 2003 and summary judgment on Count III for the period up to and including May 25, 2003.  Accordingly, Plaintiff's Motion for Partial Summary Judgment is **DENIED**.  Plaintiff, moreover, will be afforded 30 days to correct the certification deficiency previously discussed.

**IT IS SO ORDERED.**

s/Susan G. Braden
**SUSAN G. BRADEN**
**Judge**

---

[10] The court finds the counter was government property, because the Lease provided:

The Government shall have the right during the existence of this lease to make alterations, attach fixtures and erect structures or signs in or upon the premises hereby leased, which fixtures, additions or structures so place, in, upon, or attached to the said premises *shall be and remain the property of the Government*.

PX A ¶ 4 (General Provisions)(emphasis added).

The court, however, cannot determine when, or if, the counter was removed from the premises.  *See* Def Resp. PPF ¶13 ("13. Defendant vacated the property in June of 2003.  Response: Disagrees.  The Government vacated the premises on May 25, 2003. "); Pl. Resp. DPF ¶ 17 ("17. The Government vacated the premises on May 25, 2003, and paid rent through August 2003. Response: Denied. The Government did not vacate the premises until August 2003, and paid rent through July of 2003.")*;*Def. Mot. for SJ App. at 117 (Demarco Dep.).